

RECEIVED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

13 FEB 13  AM 11: 46

CASE NO ██████ ██ ██ █ ██████
8:13-cv-710-T-27-EAJ

UNITED STATES OF AMERICA,
*ex rel.* HEATHER HUDDLESTON, R.N.,

        Plaintiff/Relator,

v.

ADVENTIST HEALTH SYSTEM
SUNBELT HEALTHCARE CORP.,

        FILED UNDER SEAL PURSUANT to 31
        U.S.C. § 3730(b)(2) and §68.083 Fla. Stat.

        Defendants
_____/

---

## COMPLAINT FOR DAMAGES AND OTHER RELIEF
### PURSUANT TO THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3730) AND FLORIDA FALSE CLAIMS ACT (§68.083 FLA. STAT.)

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO.:_____

UNITED STATES OF AMERICA and
STATE OF FLORIDA
ex rel. HEATHER HUDDLESTON, R.N.

Plaintiffs/Relator,

v.

ADVENTIST HEALTH SYSTEM
SUNBELT HEALTHCARE CORP,

Defendant.

_____/

**FILED UNDER SEAL**
**PURSUANT TO 31 U.S.C. §**
**3730(b)(2) and Fla. Stat. §68.083**

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**
**PURSUANT TO THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3730) AND**
**FLORIDA FALSE CLAIMS ACT (§68.083 FLA. STAT.)**

On behalf of the United States of America, and the State of Florida, Plaintiffs and

Relator, Heather Huddleston, R.N. (hereinafter "Ms. Huddleston" or "Relator") files this qui

tam complaint against Defendant, Adventist Health System Sunbelt Healthcare Corp

(hereinafter "Adventist," "Florida Hospital," or "Defendant"), and alleges as follows:

## I.     INTRODUCTION

### A.  Federal and State Law Claims.

1.     This is an action to recover treble damages and civil penalties on behalf of the

United States of America and the State of Florida in connection with the systematic overbilling

for treatments and procedures for patients seeking oncology treatment and other therapies, in

violation of the False Claims Act, 31 U.S.C. §3729 et seq. ("FCA"), and in violation of

§68.081-68.09 of the Florida Statutes (Florida FCA).

2.     Pursuant to the FCA and Florida FCA, Relator seeks to recover, on behalf of the United States of America and the State of Florida, treble damages and civil penalties arising from false or fraudulent claims that Defendant submitted or caused to be submitted to government funded health insurance programs for reimbursement for various cancer treatments and medicines provided at Defendant's medical facilities.

3.     Despite being made aware of the unethical and fraudulent conduct, Defendant has taken little, if any, action to notify the patients who received outdated, compromised, or otherwise improperly used or stored cancer medications.   Equally as troubling, instead of making the required refunds to the federal and state governments for these false claims, Defendant has concealed the overpayments that resulted from the scheme and enjoyed the benefits of its fraudulent conduct.   Moreover, instead of making the necessary systematic changes to avoid such pervasive fraud in the future, Defendant has simply continued to bill Medicare, Medicaid and other government agencies for expensive, specifically regulated treatments and procedures and has falsely certified it was following those regulations with respect to the proper storage, use, and handling required to qualify those procedures and treatments for payment.

4.     Defendant has also repeatedly and falsely certified that it is in compliance with the regulatory conditions of participation in Medicare, Medicaid and other government programs, when it knows it is not in compliance, thereby knowingly submitting additional false claims to Medicare, Medicaid and other government agencies.

5.     Defendant has violated federal and state law in that it has submitted false claims to Medicare, Medicaid and to other government programs for treatments and drugs which it had reason to know it was overbilling, false billing, or otherwise incompatible with standards of

accepted medical practice. In addition, the Defendant falsely certified its compliance with the conditions of participation in the Medicare, Medicaid and other government programs when it knew that it was not in compliance with such prerequisites; and failed to return to federal and state governments such payments that it was not entitled to receive and that it knew it was not entitled to retain.

6.      The end result of these false claims is the unjustified and illegal enrichment of Defendant, detrimental injury and actual health risk to patients, and the corresponding loss of millions of dollars of taxpayer's funds.

7.      On behalf of the United States of America and the State of Florida, Relator seeks to recover treble damages as well as civil penalties arising from the false claims that Defendant caused to be submitted to the United States and the State of Florida, as well as money damages for the wrongful retention of overpayments and refunds that are due and payable to the United States and the State of Florida.

## II.     PARTIES

**The Relator**

8.      Relator, Heather Huddleston, R.N, is a citizen and resident of Altamonte Springs, Florida. During the period of time that Ms. Huddleston was uncovering the abusive acts of Adventist, she was known as Heather Ashley. Ms. Huddleston is a licensed Registered Nurse in the state of Florida. Ms. Huddleston obtained an Associate of Science Degree in Nursing from the Florida Hospital College of Health Services and became a certified Registered Nurse in 1996. She became chemotherapy certified in 1996 and has maintained her certification annually. Ms. Huddleston earned her undergraduate degree in Science from the University of Central Florida in 1999.

9.     Ms. Huddleston has been a member of the Oncology Nursing Society since 1996. During Relator's employment at Florida Hospital she collaborated with departments and interdisciplinary teams to develop and implement strategies to improve care, outcomes and clinical operation processes.   Relator was responsible for the management of four office locations.   Relator made drug purchases totaling $80 million a year, set up treatment protocols for the four offices, and she specialized in risk management for the physicians and nurses.

10.     Ms. Huddleston was employed by the Florida Physicians Medical Group (FPMG) from 1997 through 1999 and again from 2001 through 2009.  FPMG was a private physician's medical group that eventually would do business as the Cancer Institute of Florida. In 2009, FPMG merged with Florida Hospital Cancer Institute and was then known as the Florida Hospital Medical Group (FHMG).  As a result of the merger, Ms. Huddleston was then employed by FHMG from 2009 through December 2010.

11.     All allegations in this Complaint are based on evidence directly acquired by Relator, independently, and through her own labor and efforts.  The information and evidence Relator has obtained or of which she has personal knowledge, and on which these allegations regarding violations of the False Claims Act are based, consist of her personal involvement in working as an oncology nurse and as a Clinical Process Manager, on documents she has received in connection with her employment, and her observations and knowledge of other actions taken pursuant to policy, practice or instruction while working in Adventist facilities.

12.     None of the allegations set forth in this Complaint are based on a public disclosure of information in a criminal, civil, or administrative hearing; in a Congressional, administrative, or General Accounting Office report, hearing, audit, or investigation; or from news media. Rather, they are the independent declaration of the Relator.

13.   Relator is an original source of information within the meaning of the False Claims Act. 31 U.S.C. §3730(e)(4)(B).

**The Defendant**

14.   Adventist Health System Sunbelt Healthcare Corp is a not-for-profit organization that supports 43 hospitals in ten states and employs nearly 55,000 individuals. Florida Hospital is part of Adventist, which operates facilities in multiple states including Texas, Colorado, Kansas, Missouri, Wisconsin, Illinois, Kentucky, Tennessee, West Virginia, North Carolina, Georgia, and Florida.   As part of the Florida Hospital system, Adventist operates Florida Hospital Cancer Institute. Florida Hospital Cancer Institutes are located in Orlando, Altamonte Springs, Celebration, Kissimmee and Winter Park.

### III.   JURISDICTION AND VENUE

15.   Jurisdiction and venue are proper in this Court pursuant to the False Claims Act because Relator's claims seek remedies on behalf of the United States and the State of Florida for multiple violations of §3729 of Title 31 of the United States Codes as well as §68.082 Florida Statutes which occurred in this judicial district, and because Defendant transacts business in this District.

### IV.   THE NATURE OF THE CASE

16.   When a patient arrives at a Florida Hospital Cancer Institute (hereinafter Florida Hospital) location for chemotherapy treatment, their care is managed by of team of medical professionals which may include physicians, nurses and medical assistants.   Relator was responsible for traveling to several Florida Hospital locations to evaluate and make recommendations to Florida Hospital management on implementing better patient care standards and developing sound business practices.   Relator developed standardized

chemotherapy order sets for Florida Hospital that were implemented in the Cerner EMR Computerized Physician Order Entry (CPOE) program. Relator tracked, monitored, audited and analyzed clinical and operational data relating to hospital quality of care and cost.

17. Relator initially discovered a suspicious business practice at the Florida Hospital East Orlando (hereinafter 'East Orlando') location that focused on the improper ordering of chemotherapy medication by medical personnel at Florida Hospital. The Florida Hospital personnel were ordering the wrong size of single dose or single use vials of chemotherapy drugs. For example, consider a patient who was taking Gemzar[1] and was prescribed 1800mg of the drug. This drug was only being purchased in 1000mg vials by Florida Hospital personnel. Relator, based on her more than 15 years of experience as a chemotherapy nurse, knew that Gemzar can be purchased in 1000mg and 200mg vials.

18. The Centers for Disease Control and Prevention guidelines state that clinicians and purchasing personnel should select the smallest vial necessary for their needs when making treatment and purchasing decisions.

19. Florida Hospital personnel were using two 1000mg vials for patients who needed only 1800mg and the remaining 200mg was being discarded or wasted. Additional drugs were being ordered in the same fashion.

20. Another example involves Avastin[2]. Avastin can be purchased in 400mg and 100mg vials. The hospital personnel were using two 400mg vials for patients who only required 600mg. In this scenario, 200mg would have been discarded. Medicare rules specify that any excess medication (sometimes referred to as justified waste) from a single dose or

---

[1] Gemzar is also known as Gemcitabine and is used to treat cancers of the pancreas, lungs, breast and ovaries
[2] Avastin is also known as Benvacizumab which is used to treat lung and renal cancers

single use vial can be charged to the patient and billed to government sponsored programs.[3] During the initial stages of Relator's investigation into the improper ordering of chemotherapy drugs, she presumed that single dose vials were being ordered improperly and this was creating extra charges to the hospital and patients. Relator prepared an email on June 4, 2010, to Assistant Director Wendi Coheley that outlined her discovery. In Relator's email to Assistant Director Coheley, she noted that purchasing drugs in this manner is costly. Relator's goal was to get the medication by "spending the least amount of money and having no waste."

21.     Two days later, on June 6, 2010, Relator sent an email to Pharmacy Tech supervisor Edy Navalo requesting her assistance in training hospital personnel in the proper procedures in ordering the correct drug vial sizes. Relator stated in her email that "there is so much waste now."

22.     The improper ordering of chemotherapy drugs was costing the hospital and patients a considerable amount of money. There had been a shortage of certain chemotherapy drugs in the past and at times they were difficult to procure, however, in this case, the hospital personnel appeared to be ordering the wrong vial sizes and that the chemotherapy drugs that were required for patient care were readily available.

23.     Relator, along with Pharmacy Tech Navalo, conducted a review of the inventory of drugs being used at Florida Hospital. In addition to Avastin, Venofer was also being ordered improperly. A typical dose of Venofer was 100mg, yet 200mg single dose vials were being ordered.

24.     Relator assigned chemotherapy nurse Jessica Crump to work at Florida Hospital's Orlando East location to help out on a part time basis. Florida Hospital was

---

[3] See http://www.cdc.gov/injectionssafety/cdcposition-singleusevial.html

attempting to develop more business at Orlando East, and assigning Jessica Crump to that location was required. A short time after Jessica Crump started at Orlando East, she told Relator that she had identified multiple problems in the facility's operations. Jessica Crump stated that there were issues in billing, improper mixing of chemotherapy drugs and inaccuracies in the inventory and ordering of chemotherapy medication. As part of her management duties, Relator requested that Jessica Crump get more specifics on the issues and to match up patient records with actual billing records and submit her findings to Relator.

25.     In two emails dated July 12, 2010, Jessica Crump outlined her discovery of issues related to East Orlando. Relator reviewed the two emails from Jessica Crump as well as the corresponding patient files and nursing billing statements for each patient. Relator determined that her initial assessment that Florida Hospital personnel were just ordering the improper vial size was erroneous. Jessica Crump's review and Relator's investigation determined that the excess drugs were not merely being thrown away or discarded by the chemotherapy nurses, but rather the medication was being saved and used on the next patient who required that particular chemotherapy drug. Jessica Crump's emails detailed more than 13 patients who received medication from single dose vials where the waste (or extra amount not used for the patient) was not discarded but saved for the next patient who needed that particular medication.

26.     There is danger to patients who have received medication that should have otherwise been discarded. Single dose vials or single use vials typically lack antimicrobial preservatives and can become contaminated and serve as a source of infections. An infectious disease outbreak involving single dose or single use vials that was used on multiple patients could cause extensive harm to the patients and increase healthcare and legal expenses for the

patients and providers.    In already compromised cancer patients, the risk of infection is multiplied when inferior medication that should have been discarded is used to treat cancer patients. The infections and other issues that can arise from this activity are often overlooked or go unnoticed by medical professionals. Cancer patients seeking treatment are often left with side effects from chemotherapy drugs or radiation being administered. It is easy to dismiss or ignore the potential complications that are caused by the use of medicine that should have been discarded. Any issues arising from this are mistakenly considered to be just a side effect of medication or due to the illness itself. It is hard to determine how many patients have been placed at risk or have even died because of Defendant's unethical behavior.

27.     Jessica Crump's two emails identified 13 patients who received more than 34 chemotherapy treatments in which there was no waste, yet all patients were billed for justifiable waste. This potentially infected leftover medication was then administered 34 times to cancer patients thus jeopardizing their care and well-being. From a time period ranging from ███ ████████████████ the following patients received 100mg of Venofer from a 200mg single dose vial on the below listed dates under the supervision of the listed physician. In all of the below cases, 100mg was not actually wasted (discarded), rather it was saved until the next patient who required that drug. The patients who were administered the waste were the following:



Dr. Mekhail

Dr. Castillo

r. Castillo

Dr. Castillo

Dr. Castillo



28.   The following two patients received Oxaliplatin and Torisel from single dose vials and the waste was not discarded but likely reused:



29.   The Centers for Disease Control and Prevention (CDC) recently restated its position on protecting patients against preventable harm from improper use of single-dose/single use vials.   The CDC recognized the temptation that medical professionals may encounter when drugs remain in a single dose vial.   The CDC, in its guidance states "to prevent the unnecessary waste or temptation to use contents from single-dose or single-use vials for more than one patient, clinicians and purchasing personnel should select the smallest vial necessary for their needs when making treatment and purchasing decisions."

30.   In addition to the formal position taken by the CDC, the Centers for Medicare and Medicaid Services (CMS) adopted CDC's position and made compliance with infection control programs a requirement for participation and reimbursement in CMS programs.

31.   Defendant's drive to maximize profits by using the discarded chemotherapy medication on cancer patients showed a reckless disregard for patient safety and care.   For example, if two patients needed 600mg of a drug and the ordered size of the vials was 400mg

each, the first patient would receive one full 400mg single dose vial and a portion (200mg) of the second vial. Patient number two would receive the 200mg from the previous patients vial and a full 400mg vial.

32.     In this scenario, the first patient would be billed for the 600mg of medication received and for the 200mg that was wasted. The 200mg that should have been discarded would be stored within the chemotherapy hood area. The second patient (who needed the same medication as the first patient) would receive the leftover 200mg and a full 400mg single dose vial. In this scenario, there would be no waste (partial 200mg plus the full 400mg). It would be essential for Adventist personnel to record that 200mg of waste had occurred on the second patient in order to balance the accounting, inventory and billing of the drugs. All of this was captured in the Lynx Mobile machine.

33.     The Lynx Mobile machine played a critical role in Adventist personnel submitting fraudulent invoices. McKesson Corporation, which provides medicine, medical supplies and information technologies to the health care industry, purchased OTN in approximately 2008. OTN developed the Lynx Mobile machine. The Lynx Mobile is an automated charge capture, inventory management and reporting tool. The Lynx Mobile was specifically developed by OTN for community-based infusion therapy clinic staff to help manage inventories of drugs and medical supplies. The Lynx Mobile has a cabinet with locking devises to secure refrigerated drugs. The Lynx Mobile captures all drug and service charges.

34.     In the above example where the second patient received 600mg but created no waste (partial 200mg plus full 400mg), there still must be waste recorded in the Lynx Mobile machine. If the waste is not recorded, the inventory and accounting of the chemotherapy drugs would be out of balance. By recording the waste (charging it to the patient) but then using it on

another patient. this created an imbalance in the number of dispensed single dose vials versus the amount actually used. The manipulation of the Lynx machine occurred on a daily basis. If hospital personnel did not manipulate the Lynx Mobile machine, there scheme would have been undermined by an audit or independent review.

35.     Adventist personnel would manipulate the Lynx Mobile machine.  Hospital personnel would remove single dose vials from the Lynx Mobile machine for a patient.  The chemotherapy nurse would use the portion of the vial or vials that was prescribed by the doctor. To account for the amount of medication that was not being discarded, hospital personnel had to adjust the Lynx Mobile system to reflect that the vial was back in the Lynx Mobile so that it could be taken out under another person.  In reality, this covered the inventory to show that single dose vials were removed under a specific patient when, in fact, hospital personnel were using the single dose vials for multiple patients. This was necessary due to the Lynx Mobile's automatic inventory and billing system.  If Adventist personnel continued to use what was to be discarded on additional patients, within a short period of time there would be a discrepancy in the amount of medication used versus the actual vials left in inventory.

36.     A Lynx Mobile item audit report detailed the dispensing of Iron Sucrose to 12 patients from ███████████ through ███ ██ ███ The report details the size of the single dose vial that was used (200mg), the amount each patient received (100mg) and the waste that was recorded (zero mg).  The Lynx Mobile report shows how the data is manipulated to show the initial inventory dispensing only half of the single dose vials which creates a surplus of medication and then when the data is reconciled, the dispensed amount is a full single dose vial which covers up the fact that the wasted amount was being used on patients.

37.     The CDC's guidelines call for medications labeled as "single dose" or "single use" to be used for only one patient.  This practice protects patients from life-threatening infections that occur when medications get contaminated from unsafe use.  The CDC provides instructions on ordering single dose or single use vials to health care providers that tells them to select the smallest vial necessary.  The guidance also covers vials that have been opened or accessed (needle-punctured) and it states that all vials should be discarded at the end of the procedure for which it was used.  In addition to infection and other life-threatening risks, the drug can lose its effectiveness.  Patient care and safety is paramount in the health care industry.  By blatantly disregarding CDC guidelines, Defendant severely jeopardized the care that they were providing to patients.

38.     It was standard practice for Florida Hospital to overbill for the time it took to deliver chemotherapy and non-chemo drugs to patients.  This process is called infusion and it was regularly abused by hospital personnel.  The Centers for Medicare and Medicaid Services (CMS) provides specific regulations and guidelines to health care providers for the proper billing of infusions and injections.  During Relator's review of patient charts and billing records, she determined that infusion times as noted by hospital personnel were different than what was on the actual bill.  For example, patients would receive an infusion of medicine (chemo and non-chemo) that would be listed in the progress notes on a patient's chart as being administered between 15 - 30 minutes.  However, the billing statements would show that the medication was infused (commonly called an IV Drip) for two hours.  Hospital personnel would bill for more time than was actually performed in order to enhance revenues.  Hospitals can enhance revenues by ordering to infuse medication over a certain period of time.

39. Hospital revenue had declined in recent years due to medication reimbursements being severely reduced. As a way to generate revenues, Florida Hospital was just working the system to improve reimbursements.

40. Chemotherapy drugs and their associated costs can be substantial. Besides the price of the drug, hospital and service fees associated with the administration of the drugs and the patient care afterwards must be considered. Chemotherapy drugs range in price and in some cases the reimbursements through Medicare could be less than the purchase price of the drug. Florida Hospital personnel were keenly aware of the prices and reimbursement rates on chemo drugs and in addition to overbilling the government for single dose vials (the wasted amount) they would make up the difference in any reduced reimbursement for drugs with other hospital services. The overbilling to government sponsored insurance programs was substantial.

41. Defendant's drive to maximize profits by using chemotherapy medication that should have been discarded possibly contributed in the death of one patient as detailed below, and certainly placed thousands of others at risk to infection, complications and even premature death.

42. In ████████ ████████████ began receiving cancer treatment at the Orlando East location. ████ ████████ was a patient of Dr. Castillo and had previously been receiving treatment at the Florida Hospital Altamonte Springs and Orlando locations beginning in ████████ ████ In ████ Dr. Castillo moved to Orlando East and she told ████████████ to begin getting treatment at Orlando East.

43. Relator began tracking ████████████ tumor markers and sending them on a weekly basis to a close friend of ████████ Tumor markings are substances that are produced by cancer or by other cells of the body in response to cancer or certain benign

(noncancerous) conditions. Most tumor markers are made by normal cells as well as by cancer cells; however, they are produced at much higher levels in cancerous conditions. These substances can be found in the blood, urine, stool, tumor tissue, or other tissues or bodily fluids of some patients with cancer. Most tumor markers are proteins. However, more recently, patterns of gene expression and changes to DNA have also begun to be used as tumor markers. Markers of the latter type are assessed in tumor tissue specifically. Tumor markers may also be measured periodically during cancer therapy. A decrease in the level of a tumor marker or a return to the marker's normal level may indicate that the cancer is responding to treatment, whereas no change or an increase may indicate that the cancer is not responding. Tumor markers may also be measured after treatment has ended to check for recurrence (the return of cancer).

44. During ██ ████████ treatments at Orlando East she received multiple chemotherapy drugs including Avastin, Taxoter, Gemzar, Ixempra, Carboplatin and Abraxane. ██ ██████ was getting all medications in single dose vials. As Relator tracked ██ ████████ tumor markings, they began to rise steadily. ██ ██████ was admitted to the hospital on several occasions with infections. ███████████ condition deteriorated rapidly after beginning her treatment at Orlando East. ███████████ died on ████████████ ██ █.

45. The risk and potential issues related to mixing or the pooling of single dose or single use vials of chemotherapy medication is significant. When the discarded amount of a chemotherapy drug is saved and then mixed with new medication or with other medicine that should have been discarded, in addition to infections and contamination that can occur, the medication also loses its effectiveness. To compound the risk, hospital personnel stored the unused portion of the drugs under the chemotherapy hood and did not refrigerate or keep the

drugs in a dark environment. Medical assistants would stack the unused drugs under the chemotherapy hood and would also mix the drugs that were then given to patients. Medical assistants are not allowed to mix chemotherapy drugs.

46.    Often, during chemotherapy treatments, the physicians were not on-site to provide direct supervision. Relator questioned how the attending physician to a cancer patient was not able to observe the unethical and illegal practices by hospital personnel. The mixing of chemotherapy drugs can be hazardous to healthy people. Florida Hospital's practice of permitting medical assistants to perform this task places patients in danger. As mentioned before, the chemotherapy drugs that should have been wasted and disposed of (but were not) were stored inappropriately in the chemotherapy hood. Responsible hospital personnel under the direct supervision of a physician create an environment where medication and patient errors are reduced or eliminated. Key safety measures must be adhered to by all hospital personnel. Relator uncovered and witnessed the total disregard for patient safety and care by many Florida Hospital personnel.

47.    During Relator's employment, she uncovered an extremely hazardous situation with the chemotherapy hood. The chemotherapy hood at one Florida Hospital was more than 20 years old and had multiple serious safety issues. Relator had been attempting to get the issues resolved for more than 17 months, but was unable to convince Florida Hospital management to spend the money to fix the chemotherapy hood. The chemotherapy hood had a leak and this was exposing everyone (including patients) to dangerous chemotherapy fumes. The chemotherapy hood was not in compliance with safety guidelines which required the hood to be vented to the outside of the building rather than the same air being re-circulated through a filter.

48.     Relator witnessed and attempted to correct multiple instances of poor, indifferent and possibly harmful management practices at Florida Hospital. From patient care to the health and well-being of all Florida Hospital employees, physicians and administrators failed to uphold the most basic creed of health care providers, "first do no harm."

49.     Relator brought the issues related to the use of the single dose vials and the use of the wasted amount on subsequent patients to Defendant's management in several forums including emails, meetings, and direct communications with physicians and Defendant's administrative staff.

50.     Relator telephoned Dr. Castillo about the practice of not throwing the wasted medicine away and the overbilling that was occurring. Dr. Castillo told the Relator that he would handle the situation and get it fixed. Dr. Castillo told Relator that Robert Vargas, the Director of Specialty Operations, and his assistant director, Wendy Cohely would investigate the problems. Relator told Dr. Castillo that neither one of them were qualified enough to fix the problem. A short time later during a meeting between Relator and Robert Vargas, Robert Vargas told Relator that he would take care of the situation and that Relator should not involve herself in the matter. Specifically, Robert Vargas informed Relator that "[i]f you ever talk about this, you will never work again."

51.     After this meeting and threat from Robert Vargas, conditions had not yet changed at Florida Hospital. Relator asked Registered Nurse Jamie Postle to oversee the Orlando East location and make recommendations on how to improve the policies and procedures of Orlando East. Jamie Postle prepared a lengthy review of Orlando East's operations that outlined many of the same issues that Relator had uncovered previously. Relator submitted the recommendations to Robert Vargas and Wendy Cohely but did not hear

back from Robert Vargas. A short time later. Robert Vargas reassigned Relator to different work that kept Relator from investigating the issues at Orlando East.

52.     On October 5, 2010, Assistant Director Wendy Coheley sent out an email to Florida Hospital personnel stating that Relator was working on an important project and was not to be interrupted.   Wendy Coheley stated further that if anyone needed assistance in chemotherapy matters, that they were to contact the lead chemotherapy nurse at another facility. Relator stated that this email and the project she was given were the result of her voicing her concerns to Defendant's management about the use of single dose vials and its attempt to move her away from the situation. On October 13, 2010, Relator was given a drug and alcohol test by Florida Hospital which she passed. Relator stated that the timing of the drug test was very unusual and felt it was related to the threat she had received from Robert Vargas. Relator believed it was done to intimidate her. A few days later, Relator submitted her resignation and her last day of work was on December 3, 2010.

53.     Relator uncovered documentation of an incident involving a patient receiving epirubicin[4] on ███████ ██ ███, from a single dose vial that had been opened on ███████ ███ The manufacturer's warnings and usage instructions specifically state that the product must be used within 24 hours of first penetration of the rubber stopper and the excess should be discarded.  Relator provided the incident report and the Lynx Mobile audit report.  The patient, ███████ ██ ███ received what should have been the wasted medicine from patient ███ ███.  Patient ███ could have potentially been infected or received a dose that was considerably less potent than a fresh or new single dose vial.  This is but a single example of a practice that was endemic to Florida Hospital and uncovered by Relator.

_____

[4] A chemotherapy drug used to treat breast cancer

54.     The actual costs and reimbursement rates by Medicare for three chemo drugs is depicted below (based on third quarter 2010 costs and reimbursement rates). The 2010 pricing list which contains the unit price of drugs and the reimbursement rates for Medicare and other major insurance companies has color coded features on the chart (green, yellow and red) and it provided medical personnel with an easy way to determine if a drug was profitable or not. The color code green identified Medicare reimbursement rates for drugs that were profitable to Florida Hospital, yellow identified drugs that were equal to or slightly higher than the actual cost of the drug, and red identified drugs that would result in a loss to Florida Hospital. For example:

- Green – Avastin, purchase price $56.87 per 10mg with Medicare reimbursement of $58.45.
- Yellow – Vidaza, purchase price $4.80 per 1mg with Medicare reimbursement of $5.01.
- Red – Neulasta, purchase price $2,529.98 per 6mg with Medicare reimbursement of $2,470.74

55.     The following examples relating to three drugs are indicative of the overbilling to the government by Defendant.

56.     Avastin (used to treat lung and renal cancers) costs $56.87 per 10mg and is reimbursed by Medicare at $58.48. Avastin can be purchased in 200 and 400mg single dose vials (200mg cost is $1,137.40 and 400mg cost is $2,274.80). The government would reimburse the 200mg at $1,169.60 and the 400mg at $2,339.20. Florida Hospital personnel would buy two 400mg single dose vials for a patient who only needed 600mg. The wasted amount (200mg) would be charged to the patient and the government ($1,137.40) and then set aside to be administered to the next patient. The next patient would receive the 200mg waste from the first patient and a full 400mg dose. However, the second patient and government would be charged for 200mg of waste (although there was no waste) in order to balance the

Lynx Mobile machine.   In this example, the government would have been overcharged $2,339.20 for only two single dose vials of Avastin.  Relator estimated that multiple patients each day could receive Avastin.  If this occurred 20 times in one week, the government would be overcharged $23,392 (20 x $1,169.60) per week.

57.     A second example involves Rituxam (a cancer medication that interferes with the growth and spread of cancer cells in the body).  Rituxam costs $567.45 for 100mg and is reimbursed by Medicare at $579.21.  Rituxam can be purchased in 100mg ($567.45) and 500mg ($2,837.25) single dose vials (Medicare would reimburse the 500mg vials at $2,896.05). Florida Hospital personnel would buy two 500mg single dose vials for a patient who only needed 700mg.   The wasted amount (300mg) would be charged to the patient and the government ($1,737.63) and then saved for the next patient.  The next patient would receive the 200mg waste from the first patient and a full 500mg dose.  However, the second patient and the government would be charged for 300mg of waste (although there was no waste) in order to balance the Lynx Mobile machine.  The government would have been overcharged $3,475.76 for only two single dose vials of Rituxam.   If this occurred 20 times in one week, the government would be overcharged $34,752.60 (20 x $1,737.63) per week.

58.     The next example involves Vidaza (a cancer medication used to treat certain types of bone marrow cancers and blood cell disorders).  As noted above, Vidaza is color coded at yellow which means the reimbursement is minimal (purchase price is $4.08 per 1mg and reimbursement is $5.01).  Florida Hospital personnel would administer Vidaza by IV push but charge the patient for an infusion.  An IV push costs $229 (and takes approximately 15 minutes to administer) and an infusion can be billed at $314 for the first hour and $73 for each hour after the first.  As previously discussed, Jessica Crump and Relator uncovered the misuse of single

dose vials and the overbilling on infusions. In an email from Jessica Crump to Heather Ashley dated July 12, 2010, Jessica Crump identifies a patient who receives Vidaza and was charged two hours (infusion) when records indicate the patient received the medication by IV push. The below listed patient received Vidaza on 14 days ███████████████████████and was over billed for the services rendered.

59.   ████████ – ████████████████████████████████),
████████ ███████ Dr. George.

60.   This patient should have been charged $3,766 for this service but was charged $5,418, representing an overcharge of $1,162.

61.   Defendant's actions have caused federal and state funded health care programs to lose millions of taxpayer funds and their actions have deprived patients of receiving cancer treatment at the level of care that is expected (and required) in the United States.

## V.   THE FALSE CLAIMS ACT

62.   The FCA, as amended, provides in pertinent part that:

> [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990...plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

63.   The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in

deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

64.    The Florida FCA, as amended, provides in pertinent part that:

Any person who (a)   Knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval; (b)   Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency; (c) Conspires to submit a false or fraudulent claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid; ...(g)   Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to an agency, is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

§68.082 Fla. Stat. (2011)

65.    The terms "knowing" and "knowingly" in the Florida FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required. Innocent mistake is not a defense to an action under this act." §68.082 Fla. Stat. (2011)

## VI.   COST REPORTING AND CLAIMS PROCESSING PROCEDURES UNDER THE MEDICARE PROGRAM

66.    In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 et seq., known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426-1.

67.     Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

68.     CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 413.64. Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

69.     There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. § 1395c-1395i-5. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them. 42 U.S.C. §§ 1395j-1395w-5. The allegations herein involve both Parts A and B for services billed by the Defendant to Medicare.

70.     Under Medicare Part A, hospitals enter into an agreement with Medicare to provide health care items and services to treat Medicare patients. The hospital, also called a "provider," is authorized to bill Medicare for that treatment. Most hospitals, including the Defendant's hospitals, derive a substantial portion of their revenue from the Medicare Program.

71.     In order to get paid, a hospital completes and submits a claim for payment on a designated claim form, which, during the relevant time period, was or has been designated either as a Form UB-4 (also known as a CMS-1450) or a Form UB-92. This form contains

patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the UB-4/UB-92 to determine whether and what amounts the hospital is owed.

72. In addition, at the end of each fiscal year, CMS requires hospitals to submit a Form 2552, more commonly known as the Hospital Cost Report, to the fiscal intermediary. The Hospital Cost Report contains information on facility characteristics, utilization data, costs, Medicare settlement data, financial statement data, and cost and charges by cost center. 42 C.F.R. § 413.20(b), 42 U.S.C. § 1395g.

73. While Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-4s/UB-92s) during the course of the fiscal year, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider and is reported on the annual Hospital Cost Report. This total determines Medicare's liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due to either the Medicare Program or the provider.

74. Medicare relies on the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than the provider has already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60, and 413.64(0)(1).

75. A key purpose of the Hospital Cost Reports is to protect the federal government from loss due to mistake or fraud. Medicare has the right to audit Hospital Cost Reports and financial representations made by program participants to ensure their accuracy and preserve

the integrity of the Medicare Trust Funds.   However, while Hospital Cost Reports are potentially subject to audit review, it is generally known throughout the health care industry that fiscal intermediaries do not have sufficient resources to perform in-depth audits on the majority of Hospital Cost Reports submitted to them.   It is also generally known through the health care industry that two to three years will elapse from the time Hospital Cost Reports are filed until they are finalized. For these reasons, the cost reporting system relies substantially on the good faith of providers to prepare and file accurate Hospital Cost Reports.

76.   To this end, the Hospital Cost Report, Form 2552, contains the following warning:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

77.   That advisory is then followed by the following "Certification," which must be signed by the chief administrator of the provider or a responsible designee of the administrator:

> CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)
>
> I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding

the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

78.    In order to get paid from Medicare, providers, like Defendant herein, complete and submit a claim for payment on a designated Health Insurance Claim Form, which, during the relevant time period, was or has been designated CMS 1500. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the CMS 1500 to determine whether and what amounts the provider is owed.

79.    To this end, the Health Insurance Claim Form, CMS 1500, contains the following certification by the physician or supplier submitting a claim to Medicare:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

That certification is then followed by the following "Notice:"

> Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## VII.    CONDITIONS OF PARTICIPATION AND CONDITIONS OF PAYMENT

80.    To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The provider agreement requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

### i.    Medical Necessity and Appropriateness Requirements

81.    One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate information.  42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

82.    Various claims forms, including but not limited to the Hospital Cost Report and the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations.  42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406.  Providers must also certify that the information submitted is correct and supported by documentation and treatment records.  Id.  See also, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

83.    The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

**ii.    Obligation to Refund Overpayments**

84.    As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports).  42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C.  See also 42 C.F.R. §§ 489.40, 489.31.  In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony.  Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments.  42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

85.     Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS.  42 U.S.C. § 1395u(l)(3).  In such cases, the overpayment is subject to recoupment.  42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments.  42 U.S.C. § 1395l(j).

### iii.     Peer Review and Quality Assessment Obligations

86.     Another important requirement for a hospital that wishes to participate in the Medicare Program is that the hospital "must have an organized medical staff that operates under bylaws approved by the governing body and is responsible for the quality of medical care provided to patients by the hospital." 42 C.F.R. § 482.22.  Hospitals must "develop, implement, and maintain an effective, ongoing, hospital-wide, data-driven quality assessment and performance improvement ['QAPI'] program." 42 C.F.R. § 482.21.

87.     As part of its QAPI program, a hospital "must set priorities for its performance improvement activities that (i) focus on high-risk, high-volume, or problem-prone areas; (ii) consider the incidence, prevalence, and severity of problems in those areas; and (iii) affect health outcomes, patient safety, and quality of care." Id. § 482.21(c)(1).

88.     Finally, a hospital "must track medical errors and adverse patient events, analyze their causes, and implement preventive actions and mechanisms[.]" Id. § 482.21(c)(2).

### VIII.   OTHER FEDERALLY-FUNDED HEALTH CARE PROGRAMS

89.     Although false claims to Medicare are the primary FCA violations at issue in this case, the patients who were subjected to the medically unnecessary procedures that are the subject of this action were beneficiaries of one of three federally-funded health care benefit programs – Medicare, Medicaid, or TRICARE/CHAMPUS.  Accordingly, those other two programs are briefly discussed as well.

90.    The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals. CMS administers Medicaid on the federal level, while the Florida Agency for Healthcare Administration fills that role for the State of Florida.   Reimbursement of hospital costs or charges is governed by Part A of Medicare, through the hospital cost report system, and reimbursement of physician charges is governed by Part B of Medicare. As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of appropriate and necessary care to Medicaid beneficiaries.

## IX.    TRICARE, formerly known as CHAMPUS

91.    A federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, et seq.).   Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).    And, like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5).

## X.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

Presentation of False Claims Pursuant to 31 U.S.C. § 3729(a)(1)(A)

92.   Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 93 of this Complaint as if fully set forth herein.

93.   As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendant has knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

### SECOND CAUSE OF ACTION

Making or Using False Record Statement to Cause Claim to be Paid
Pursuant to 31 U.S.C. § 3729(a)(1)(B)

94.   Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 93 of this Complaint as if fully set forth herein.

95.   As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendant has knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendant – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

### THIRD CAUSE OF ACTION

Making or Using False Record Statement to Avoid an Obligation to Refund
Pursuant to 31 U.S.C. § 3729(a)(1)(G)

96.   Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 93 of this Complaint as if fully set forth herein.

97.   As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendant has knowingly made, used, or caused to be made or used, false records or

statements – i.e., the false certifications and representations made or caused to be made by Defendant – material to an obligation to pay or transmit money to the Government to knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

### FOURTH CAUSE OF ACTION

Presentation of False Claims Pursuant to §68.082(a) Fla. Stat.

101.   Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 93 of this Complaint as if fully set forth herein.

102.   As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendant has knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of §68.082 (2)(a) Fla. Stat.

### FIFTH CAUSE OF ACTION

Making or Using False Record Statement to Cause Claim to be Paid
Pursuant to §68.082 (2)(b) Fla. Stat.

103.   Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 93 of this Complaint as if fully set forth herein.

104.   As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendant has knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendant – material to false or fraudulent claims in violation of §68.082 (2)(b) Fla. Stat.

### SIXTH CAUSE OF ACTION

Making or Using False Record Statement to Avoid an Obligation to Refund
Pursuant to §68.082 (2)(g) Fla. Stat.

105.   Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 93 of this Complaint as if fully set forth herein.

106.   As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendant have knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay to the Government.

## XI.   DEMAND FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States Government and the State of Florida, demand judgment against the Defendant, ordering that:

**As to the Federal Claims:**

a.   Pursuant to 31 U.S.C. § 3729(a), Defendant pay an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000 and not more than $10,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*;

b.   Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3729(d) of the False Claims Act and/or any other applicable provision of law;

c.   Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law; and

d.   Relator be awarded such other and further relief as the Court may deem to be just and proper.

**As to the State Claims:**

a.   Pursuant to §68.082(2)(g), Defendant pay an amount equal to three times the amount of damages the State of Florida has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of the Florida False Claims Act;

b.   Relator be awarded the maximum amount allowed pursuant §68.085 of the Florida False Claims Act and/or any other applicable provision of law;

c.   Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by§68.086 and any other applicable provision of the law; and

d. Relator be awarded such other and further relief as the Court may deem to be just and proper.

## TRIAL BY JURY

Relator hereby demands a trial by jury as to all issues.

Dated: February 12, 2013.

Respectfully submitted,

John A. Yanchunis
Florida Bar No. 324681
jyanchunis@forthepeople.com
MORGAN & MORGAN, P.A.
201 One Tampa City Center, 7th Fl.
Tampa, Florida 33602
(813) 223-5505 (Telephone)
(813) 275-9295 (Facsimile)
*Attorney for Relator*